IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Richard P. Matsch

Civil Action No. 03-cv-00631-RPM

THE SORKIN, LLC,
Individually and On Behalf of All Others Similarly Situated,

      Plaintiff,

v.

FISCHER IMAGING CORPORATION,
MORGAN NIELDS, and
LOUIS RIVELLI,

      Defendants.

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

JUN 21 2005

GREGORY C. LANGHAM
CLERK

---

## ORDER DISMISSING AMENDED CLASS ACTION COMPLAINT

---

This action is a securities class action brought on behalf of purchasers of the common

stock of Fischer Imaging Corporation ("Fischer" or "the Company") against Fischer and two of

its former chief executive officers.  Fischer is a Delaware corporation with its principal place of

business in Denver, Colorado.  Fischer is in the business of designing, manufacturing, and

marketing specialty mammography and general purpose x-ray systems for the diagnosis and

treatment of disease.  During the time period relevant to this action, Fischer stock was listed and

actively traded on the NASDAQ National Market System.

On April 1, 2003, Fischer issued a press release announcing that, based on a review being

conducted in connection with a change in auditors, the Company would delay the filing of its

Form 10-K annual report for the year ended December 31, 2002.  The announcement also noted

that the Company believed it would be necessary to restate its financial statements for the first

three quarters of 2002 and the years ended December 31, 2001 and 2000.  The price of Fischer's common stock dropped following this announcement.

This securities class action was filed by The Sorkin, LLC ("Sorkin") on April 10, 2003, nine days after the announcement of the expected earnings restatement.  The original complaint defined the class period as February 14, 2001, through April 1, 2003.  Named as defendants were the Company and three individuals:  Mr. Morgan Nields, Mr. Louis Rivelli, and Mr. Gerald Knudson.  Mr. Nields had served as Chief Executive Officer ("CEO") before the commencement of the class period from 1973 through November 2000 and held the position of Chairman of the Board of Directors during the class period.  Mr. Rivelli followed Mr. Nields as CEO in November 2000 and held that position until April 2002.  Mr. Knudson became the Company's CEO in April 2002.

The complaint alleged that press releases and quarterly and year-end statements filed with the Securities and Exchange Commission ("SEC") misrepresented the Company's financial condition by failing to disclose that the Company had overstated its income, improperly booked revenue and lacked adequate internal controls to ascertain its true financial condition.  The complaint stated that these failings resulted in the artificial inflation of the value of the Company's common stock during the class period.  The plaintiff alleged that Mr. Nields, Mr. Rivelli, and Mr. Knudson were privy to the true facts concerning the Company's financial condition, that they engaged in a fraudulent scheme to enhance their own positions and compensation, and that the alleged scheme could not have been perpetuated over a period of time without the knowledge and complicity of personnel at the highest level of the Company.  The plaintiff claimed that the defendants violated § 10(b) of the Securities Exchange Act of 1934, 15

U.S.C. § § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, and that the individual defendants were also liable as controlling persons under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

These allegations were pleaded on "information and belief," based on public information obtained by plaintiff's counsel, including press releases, SEC filings, media reports, news articles, analysts' reports, and information available on the Internet. (Compl., p. 2). The original complaint stated, "Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery." (Id.).

After Sorkin filed its class action complaint, a similar complaint was brought by James K. Harbert in Civil Action No. 03-M-996. Motions to consolidate were filed, along with competing motions for the appointment of lead plaintiff and approval of the selection of lead plaintiff's counsel. Because the complaints appeared to be inadequately pleaded under the standards applicable to private securities class actions, the court denied the motions to consolidate and postponed the appointment of a lead plaintiff until the sufficiency of the complaints had been determined.

The defendants then moved pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6) for dismissal of the complaints in both actions, arguing that the allegations failed to meet the pleading requirements of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § § 78u-4 ("PSLRA"). In Civil Action No. 03-M-996, the plaintiff voluntarily dismissed his complaint, thus eliminating the conflict over consolidation and the appointment of a lead plaintiff. Mr. Harbert joined Sorkin as a putative class representative in the filing of an amended class action complaint in this action on October 21, 2003.

The amended complaint names as defendants the Company, Mr. Nields, and Mr. Rivelli, and asserts § 10b claims against all of them and § 20(a) claims against the individual defendants. The claims previously stated against Mr. Knudson in the original complaint were not included in the amended complaint. The amended complaint defines the class period as lasting from February 14, 2001, until July 17, 2003, the date on which Fischer issued a press release announcing preliminary restatements of its 1998-2001 financial statements (the "Class Period"). This extended Class Period would include within the putative class purchasers who bought Fischer stock *after* the filing of the original complaint. The amended complaint is based mainly on information supplied by eighteen former employees who are not identified by name, but are referred to in the amended complaint as confidential witnesses ("CW") one through eighteen.

On January 20, 2004, Fischer moved pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6) for dismissal of the amended complaint, arguing that the allegations of the amended complaint are still insufficient to state a claim against it. The individual defendants filed similar motions as to the claims against them.

*Pleading standards applicable to claims for securities fraud*

To state a claim for securities fraud under § 10(b) of the Exchange Act and Rule 10b-5, a complaint must contain allegations supporting the following five elements: "(1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make the statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with an intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements, and (5) the plaintiff suffered damages as a result of his reliance." *Adams v. Kinder-Morgan, Inc.*, 340

F.3d 1083, 1095 (10th Cir. 2003).

Fed. R. Civ. P. 9(b) requires that the circumstances constituting fraud be stated with particularity. This standard has been described as requiring that a plaintiff specify "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir. 1990).

The PSLRA heightened the standard for pleading a federal securities fraud claim. *See City of Philadelphia v. Fleming Cos.,* 264 F.3d 1245, 1258 (10th Cir. 2001). The PSLRA requires that a plaintiff "specify each statement alleged to have been misleading" and the "reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). "[I]f an allegation regarding a statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* The PLSRA also heightened the standard with respect to the pleading of scienter. A plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

The traditional standard of review on a motion to dismiss pursuant to Rule 12(b)(6) is that all well-pleaded allegations in the complaint must be accepted as true and considered in a light most favorable to the plaintiff. *Sutton v. Utah State Sch. for the Deaf and Blind,* 173 F.3d 1226, 1236 (10th Cir. 1999). In *Pirraglia v. Novell, Inc.,* 339 F.3d 1182 (10th Cir. 2003) the United States Court of Appeals for the Tenth Circuit considered the relationship between the PSLRA and this standard. *Pirraglia* instructs that in evaluating allegations of scienter in a securities fraud complaint, the court may consider negative inferences that may be drawn against the plaintiff. *Id.* at 1187. Nevertheless, when "faced with two seemingly equally strong inferences,

one favoring the plaintiff and one favoring the defendant, it is inappropriate for [the court] to make a determination as to which inference will ultimately prevail, lest we invade the traditional role of the factfinder." *Id.* at 1188. To satisfy the PSLRA's pleading requirement with respect to scienter, a plaintiff must plead facts with particularity that, "in the overall context of the pleadings, including potentially negative inferences, give rise to a strong inference of scienter." *Id. Pirraglia* also holds that the interplay of the PSLRA and Rule 12(b)(6) means that when determining whether misleading statements are pleaded with particularity, the court should not draw inferences unfavorable to the plaintiff, and the court must refuse to draw inferences favorable to plaintiffs "when doing so would allow them to make allegations 'on information and belief' without satisfying the particularity requirements of the Reform Act." *Id.*

> *The alleged misleading statements and the plaintiffs' identification of how they were misleading*

The amended complaint states that during the Class Period the defendants misrepresented the Company's financial condition in numerous press releases and in financial statements filed with the SEC, and that these misrepresentations were incorporated in analysts' reports during that time period. (Am. Compl. ¶¶ 149-241). The plaintiffs assert that the defendants failed to disclose that the Company's income was overstated due to a combination of accounting errors and internal control problems. According to the plaintiffs, the defendants' misconduct falls into two main categories: (1) improper revenue recognition practices; and (2) improper inventory control, valuation, and reporting practices. (Pl.'s opp. br. at 5).

The plaintiffs allege that a variety of practices resulted in the premature or improper recognition of revenue by Fischer. It is alleged that the Company recognized revenue for medical

devices that had not yet been shipped but remained in Fischer's warehouses ( ¶¶51-55, 76), for devices that had been shipped but not installed (¶¶56-58), for devices that were defective when installed (¶¶ 59-69), and for devices that were not ready for delivery or were to be shipped in future periods (¶¶ 70-76). The amended complaint states that the recognition of revenue under these circumstances violated SEC Staff Accounting Bulletin No. 101. (¶¶ 45(a), 49, 54, 58). The amended complaint further alleges that the Company failed to address quality control problems and that these failures contributed to the manufacturing and shipping of defective products (¶¶ 85-103).

The plaintiffs also allege that inventory was improperly valued because the Company overstated the value of parts exchanged by customers for replacements (¶¶ 104-106); failed to write down or write off excess and obsolete inventory (¶¶ 107-142); manipulated inventory audit procedures with the goal of recording a predetermined inventory value (¶¶ 121-130); failed to accurately track and value a certain category of inventory referred to as field/service inventory (¶¶ 135-37), and used an unreliable computer program for inventory valuation (¶ 142). The amended complaint states that the Company reported a charge of $9.342 million for "inventory write down and other charges" in June 2002 (¶¶ 133-34), but that the Company should have written down the value of its inventory in earlier time periods (¶ 220).

The primary issue presented by the defendants' motions to dismiss is whether the allegations of the amended complaint are sufficient with respect to the element of scienter. To make that determination, the court does need not to consider purported misrepresentations that are not stated with sufficient particularity, *see Pirraglia*, 339 F.3d at 1191, and no consideration need be given to alleged misstatements that are immaterial or too vague to be considered

misleading. "A statement or omission is only material if a reasonable investor would consider it important in determining whether to buy or sell stock." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997). A statement is material if it significantly altered the 'total mix' of information available." *Id.* (quoting *TSC Indus, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

Paragraph 154 identifies the following statement in Fischer's 2000 Form 10-K as a misleading statement: "Although we strive to operate within FDA requirements, there can be no assurance that deficiencies can be corrected or that we can satisfy future FDA compliance concerns." The plaintiffs contend this statement is materially false, based on their allegations that Fischer intentionally sacrificed quality and compliance to recognize revenue. To the contrary, this statement cannot be considered misleading or material because the complete sentence warns investors that FDA compliance could not be assured.

In paragraphs 163-64, the plaintiffs identify as misleading the following statement in the Company's 2000 Form 10–K: "Our quality assurance program includes various quality control measures from inspection of raw materials, purchased parts and assemblies through on-line inspection." The plaintiffs' allegations of inadequate quality controls do not render this statement false. Moreover, the amended complaint lacks specific allegations about how quality control problems impacted the Class Period financial statements.

Paragraphs 172, 176, and 179 identify as misleading certain statements made by Mr. Rivelli in the spring and summer of 2001 describing Fischer as having become more efficient and profitable. Defendant Fischer argues that these statements are not actionable, characterizing them as "puffing," or soft statements of corporate optimism. "Statements

classified as 'corporate optimism' or 'mere puffing' are typically forward-looking statements, or are generalized statements of optimism that are not capable of objective verification." *Grossman*, 120 F.3d at 1119. Mr. Rivelli's descriptions of the Company as more efficient and profitable are problematic because they are relative statements requiring a basis of comparison.

### The sufficiency of the allegations of scienter

The question then is whether the amended complaint states with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind. In a securities fraud case brought under § 10b of the Exchange Act, "the appropriate level of scienter is 'a mental state embracing intent to deceive, manipulate, or defraud,' or recklessness." *Kinder-Morgan*, 340 F.3d at 1105 (quoting *Fleming*, 264 F.3d at 1259). Conduct is reckless if it amounts to an extreme departure from the standards of ordinary care and presents a danger of misleading buyers or sellers which is either known to the defendant or so obvious that the defendant must have been aware of the danger. *Fleming*, 264 F.3d. at 1260. A strong inference of scienter is "a conclusion logically based upon particular facts that would convince a reasonable person that the defendant knew a statement was false or misleading." *Kinder-Morgan*, 340 F.3d at 1105.

Scienter cannot be inferred solely from the earnings restatement. *In re Bristol-Myers Squibb Sec. Litig.*, 312 F.Supp.2d 549, 565 (S.D.N.Y. 2004). "[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." *Fleming*, 264 F.3d at 1261 (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000); *see also Chill v. General Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996). To state a claim for securities fraud, allegations of accounting irregularities must be coupled with facts showing that the "irregularities were the result of the defendant's fraudulent intent to mislead investors." *Fleming*,

264 F.3d at 1261. The inference of fraudulent intent must be strong in light of the "totality" of the pleadings. *Pirraglia*, 339 F.3d at 1191.

The size of the earnings restatement is relevant to the assessment of scienter. *See Kinder-Morgan*, 340 F.3d at 1106 ("Strengthening the inference that [the defendant] knew of the statements was the magnitude of the alleged falsity."). The earnings restatement announced on July 17, 2003, was significant in comparison to the Company's previous reports of its financial condition. The Company had previously reported net income of $2.1 million for the year 2000. The preliminary earnings restatement reduced that amount to $0.2 million. The Company had previously reported net income of $3.3 million for the year 2001. The preliminary restatement resulted in a net loss of $0.8 million for that year. (¶¶ 46, 246). Still the question is whether the plaintiffs have alleged particular facts showing that each of the defendants either knew or ignored obvious signs that the Company's previous financial disclosures misrepresented material facts.

The plaintiffs contend that the allegations in the amended complaint about the Company's accounting and inventory practices show that the defendants acted at least recklessly. Those allegations are based on information supplied by eighteen anonymous sources who are former employees of the Company. Paragraphs 23 through 41 identify each confidential witness ("CW") by job description.

The rule in this circuit is that a plaintiff is not required to disclose the source of all of the information underlying the complaint. *Kinder-Morgan,* 340 F.3d at 1102; *see also Novak*, 216 F.3d at 313 ("Our reading of the PSLRA rejects any notion that confidential sources must be named as a general matter."). The weight to be accorded to the allegations depends on the level of detail and specificity of the allegations and factors such as the source of the information,

-10-

whether the sources are disclosed, and their reliability. *Kinder-Morgan*, 340 F.3d at 1102. The United States Court of Appeals for the Tenth Circuit has explained, "Little weight would be accorded to a plaintiff's allegations that, for instance, simply stated that an unidentified employee working for the defendant believed that a certain corporate profit statement was misleading. By contrast such an allegation would carry more weight if the complaint identified the name or title of a person working for the chief financial officer who participated in the preparation of the company's financial reports and who claimed to know that a certain financial statement was misleading." *Id.*[1] Thus assessing the particularity of the plaintiffs' allegations "entails an examination of the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Calif. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004).

*Improper revenue recognition*

The allegations of improper revenue recognition are attributed to CWs 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 15, 16, 17, and 18. With the exception of CW 2 , the jobs of these witnesses were unrelated to accounting. CW 12 is identified as having held "several managerial positions," but those positions are not identified. No specific facts are alleged to show the level of responsibility of any of these employees.

Four of the confidential witnesses (CW 4, CW 8, CW 12, and CW 15) purport to have

---

[1]In *Kinder-Morgan,* the court was speaking of the determination under 15 U.S.C. § 78u-4(b)(1) of whether allegedly fraudulent statements were identified with sufficient particularity when made on information and belief, but the same evaluative process is useful in the determination under § 78u-4(b)(2) of the sufficiency of the allegations of scienter.

direct knowledge regarding revenue recognition. CW 4, CW 8, and CW 12 are identified as sources of information supporting the claim that Fischer improperly accelerated revenue by recording revenue for defective or warehoused products, but the plaintiff provided no facts showing how these sources would have had access to first-hand information about Fischer's accounting procedures. Information attributed to CW 15 is included under a heading in the amended complaint stating, "Fischer improperly recognized revenue on units that had not been shipped, or that had been shipped but not installed" (Am. Compl., p. 16), but no facts are provided to show how a shipping and receiving clerk would have known how, when, or why the Company booked revenue.

CW 2, the only witness whose job description relates to accounting, is described as a cost accountant. The information supplied by CW 2 relates to an unreliable computer program used for tracking vendor payables. (¶¶ 78-79). The statement that a procedure for tracking vendor payables was "known to be prone to error" due to an unreliable computer program is too vague to give rise to a strong inference that the Company or the individual defendants intentionally or recklessly misled investors about the Company's true financial picture.

Six of the confidential witnesses (CWs 2, 4, 6, 8, 9, and 12) were not employed at Fischer during the Class Period. The plaintiff contends that this factor is irrelevant, arguing that information supplied by these witnesses shows a pattern of corporate misconduct that continued throughout the Class Period. While it is true that the Company's business practices before the Class Period may be relevant to its financial condition during the Class Period, the plaintiffs' allegations still must satisfy the particularity requirements of Fed. R. Civ. P. 9 and the PSLRA. Generalized allegations referring to "senior management" are not sufficient, such as the

-12-

following statement in paragraph 52: "According to CW 9, the decision to allow the ship-in-place policy came from senior management." Paragraph 56 states, "During 2000, however, Fischer's outside auditor advised senior management that the Company should recognize revenue on shipped units only after the device was installed, working, and accepted by the customer." The source of this information is unclear, and there are no details about how the source learned such information. Without more specific details, "we are left to speculate whether the anonymous sources obtained the information they purport to possess by firsthand knowledge or rumor." *Chubb Corp.*, 394 F.3d at 148.

Allegations regarding "senior management" are also insufficient because senior management could encompass various individuals, depending upon the time frame. After November 2000, Mr. Nield's role was Chairman of the Board, a position that does not necessarily entail attention to day-to-day operational details. Mr. Rivelli took over as the Company's CEO in November 2000. CW 2, CW 4, CW 6, and CW 9 were no longer employed at Fischer at that time. CW 8 and CW 12 left the Company in the fall of 2000. Information supplied by them cannot be relied upon for the purpose of assessing Mr. Rivelli's conduct as CEO. Mr. Rivelli left his employment with the Company in April 2002, over a year before the end of the Class Period – a fact that highlights the necessity of well-pleaded facts showing "who, what, where, and when."

The plaintiffs rely on statements such as "Rivelli's focus was on getting products shipped, and he pressured employees to get the product 'out the door,' regardless of commercial readiness" (¶ 61), but such allegations lack the specificity required to show fraudulent intent. Similarly, the allegations of paragraph 75, describing meetings where there were discussions

-13-

about how to accelerate sales, are also too general to support an inference of scienter. Without specific facts about who was present and what information was presented, there is no way to determine whether the matters discussed involved improper techniques for accelerating revenue or legitimate techniques for closing sales. Paragraphs 81- 83 describe Fischer's shipment of one unapproved "MammoVision" device to Japan in late 1999 or early 2000, but no facts are alleged to show that the shipment of a single device, even if unauthorized, had a material impact on the Company's revenues. These allegations contribute nothing to the plaintiffs' claim of securities fraud. Scienter cannot be inferred from statements such as "Defendants knowingly or recklessly shipped defective and/or incomplete product, and improperly recognized revenue at the time of shipment of such defective and/or incomplete equipment." (¶ 59). Bald assertions and legal conclusions do not meet the pleading requirements of Rules 9(b) and 12(b)(6), or the requirements of the PSLRA.

*Improper inventory control, valuation, and reporting practices*

The plaintiffs' allegations regarding the Company's inventory practices suffer from the same deficiencies. The plaintiffs characterize the Company's July 17, 2003 press release as an admission of wrongdoing, but the Company's acknowledgment of past accounting errors is not an admission of a scheme to defraud the investing public. Management's adoption of a more conservative approach to calculating excess and obsolete inventory, based on changes in product offerings and the high risk of technological obsolescence in an increasingly competitive environment (¶ 110), does not show that management's prior choices were fraudulent or reckless.

The plaintiffs' allegations about Fischer's inventory practices are attributed to CWs 1, 2, 4, 5, 6, 8, 9, 12, 13, 14, 16 and 17. Seven of them (CWs 2, 4, 6, 8, 9, 12, and 17) did not work at

Fischer during the Class Period.  CW 5 was a quality control engineer who worked for Fischer

for two years, and only for a few weeks during the Class Period.  CW 13 is identified as

machinist who made component parts for x-ray machines.  CW 16 worked in document control

for less than six months.  These anonymous sources are not persons whose job responsibilities

would have given them access to information about how the Company determined its inventory

accounting policies.

The plaintiffs' allegations regarding inventory are replete with conclusory allegations.

Under the heading of "inadequate inventory control, valuation, and reporting procedures" are

statements regarding quality control deficiencies.  (¶¶ 85-103).  The plaintiffs' allegations about

quality control include statements such as "Fischer did not address violations identified in the

FDA's warning letters" (attributed to CW 4), and the Company "knowingly failed to conduct or

document the proper testing for new product development (attributed to CW 5).  These are

conclusions, not detailed facts.  Scienter cannot be inferred from allegations such as those in

paragraph 97 which states, "CW 6's predecessor told CW 6 that Fischer put quality control on the

back burner."  A statement made by departing employee and repeated by another former

employee is a rumor, not a well-pleaded factual allegation.

Where concrete facts are attributed to persons whose job responsibilities would have

provided them with knowledge of the information they purport to possess, those factual

allegations show careless business practices rather than fraud.  The allegations of paragraph 92

are attributed to CW 16, an employee who worked on documenting the manufacturing process.

CW 16 stated that documentation for the manufacturing process was not always updated to

reflect engineering changes.  This allegation, by a source who worked at the Company for less

than six months, shows carelessness by those with responsibility for documentation, but it does not support a strong inference of intentional or reckless misconduct on the part of the defendants. Paragraph 128 contains allegations attributed to CW 1, an engineer who was employed by the Company during the Class Period. These allegations relate to an audit of the Engineering Department's inventory. According to CW 1, those conducting the audit were sometimes unable to determine whether a particular item was an item on the inventory list, and in some cases "they simply said that it was." (¶ 128). Again, this allegation shows carelessness on the part of those conducting the day-to-day operations of the inventory audit, but it does not show a fraudulent scheme by all the defendants. Similarly, the information provided by CW 14 about an inventory management software program and Company's the failure to use the "in-transit" tracking functions of that program shows poor business practices. (¶¶ 136-37). These allegations reflect bad management, but poor management is not actionable under the securities laws. *In re Stone & Webster, Inc., Sec. Litig.* 253 F.Supp.2d 102, 123-24 (D. Mass. 2003).

Paragraph 116 states that Mr. Nields and Mr. Rivelli were aware of Fischer's inventory procedures by virtue of their positions within the company. Fraud cannot be inferred from this sort of general allegation, which purports to impute intent based on a defendant's job title. *See Fleming*, 264 F.3d at 1264. The plaintiffs' characterization of Mr. Rivelli as "hands-on manager" (¶ 116) does not cure this defect. *See Johnson v. Tellabs, Inc.*, 303 F.Supp.2d 941, 962 (N.D. Ill. 2004) ("Such general 'hands on' allegations, however, are insufficient to establish scienter.")

The plaintiffs allege that Mr. Rivelli received internal reports showing quality control problems (¶ 98) and customer complaints (¶ 102), but mere access to internal reports does not

establish a strong inference of scienter. *See Tellabs*, 303 F.Supp.2d at 962-63. Scienter is not

shown by conclusory allegations that to the effect that "senior management" knew about quality

control violations and ignored them (¶ 103), or that Rivelli was "dismissive" of reported

problems. (¶ 89). In addition, the allegations are vague about how customer complaints or

quality control issues impacted the Class Period financial statements.

　　More pertinent to the alleged misrepresentations are the allegations that Rivelli received

reports during 2000 showing large amounts of aging inventory (¶¶ 117, 130). Nevertheless, the

plaintiffs' allegations about obsolete inventory are so intertwined with unreliable statements that

it is not possible to sort the well-pleaded allegations from conclusory statements and speculation.

Paragraph 118 includes the following statement, "CW 13 stated (based upon information

provided by Jim Swaim, a Fischer Maintenance Manager) that Fischer had a warehouse located a

few miles from its main factory that was full of 'junk' inventory." This type of second-hand

information is inherently unreliable. Neither the court nor the defendants should be required to

sift through a ninety page complaint to determine what remains after such statements are

disregarded.

　　Of the 278 paragraphs in the amended complaint, only seven refer specifically to

Mr. Nields. (¶¶ 7, 8, 73, 86, 87, 248, 249). Paragraph 7 describes Mr. Nields' position as

Chairman of the Board during the Class Period, and paragraph 8 describes Mr. Nields'

introduction of Mr. Rivelli as the Company's new CEO. Paragraph 73 relates an occurrence in

October 2001 involving problems with one machine. Paragraph 86 refers to Mr. Nields' receipt

of warning letter issued by the FDA to Fischer in 1997 – four years before the commencement of

the Class Period. Paragraph 87 states that Mr. Nields was a signatory of Fischer's Form 10-K for

the year 2000. None of these allegations create a strong inference of scienter on the part of Mr. Nields, whose role during the Class Period was as a director. In *Adams v. Kinder-Morgan*, the Tenth Circuit Court of Appeals held that allegations regarding an individual's position as member of a corporation's board of directors were insufficient to show the requisite intent of that individual. The court explained, "Conclusory allegation about the involvement of 'senior management' does not amount to a particularized claim that Kinder – who was a director not a manager – knew about the false statements." 340 F.3d at 1107.[2]

*Motive*

Paragraphs 248 and 249 describe sales of Fischer stock in 2001 by Mr. Nields and Mr. Rivelli.[3] Sales of stock personally held by a defendant are relevant to whether the allegations, taken as a whole, give rise to a strong inference of scienter. To create a strong inference of scienter, the plaintiff must allege facts showing that the trades were made at times and in quantities that were suspicious. *In re Qwest Communications Int'l Sec. Litig.*, 2004 U.S. Dist. LEXIS 584, *42 (Jan. 13, 2004). Relevant factors include:

> (i) whether the alleged trades were "normal and routine" for the insider; (ii) whether the profits reaped were substantial enough in relation to the compensation levels for any of the individual Defendants so as to produce a suspicion that they might have had an incentive to commit fraud; and, (iii) whether, in light of the insider's total stock holdings, the sales are unusual or suspicious.

*Id.* at *42-43 (citing *In re Micro Strategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 644 (E.D.Va.

---

[2]At a hearing on March 3, 2005, the plaintiffs' counsel stated regarding the question of scienter and Mr. Nields' motion to dismiss, "[I]t would not have surprised us if Your Honor ruled on the motion if Mr. Nields was dismissed from the action." (Transcript, March 3, 2000, at 19:6-11).

[3]The plaintiff has acknowledged computational errors in the totals of shares sold by Nields and Rivelli, and the proceeds of Nields' shares.

2000)).

The amended complaint includes information about the amount and dates of sales by Mr. Nields and Mr. Rivelli, but there is little information about the context of these sales. No facts are provided to permit a comparison of these sales to the individual defendants' total stock holdings or their level of compensation, and there is no information about Mr. Nields' normal trading practices. Without any such information, the plaintiffs' statement that these sales were "unusual and suspicious" is conclusory. "[M]ere pleading of insider trading, without regard to either context or the strength of the inferences to be drawn, is not enough." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 198 (1st Cir. 1999).

Paragraph 250 alleges that the individual defendants also were motivated by a desire to avoid jeopardizing Fischer's credit facility. The desire to maintain a credit facility is a motive shared by all corporate executives. This type of allegation is relevant, but adds little to the scienter analysis. *See Fleming*, 264 F.3d at 1269.

The heightened pleading standards of the PSLRA impose a responsibility on courts to carefully scrutinize securities class action complaints. Examination of the original complaint reveals that plaintiff's "information and belief" pleadings rested on nothing more than the assumption that a sizeable earnings restatement covering several years must be evidence of a fraudulent scheme by the Company's senior officials, and hope that evidentiary support would exist "after a reasonable opportunity for discovery" (Compl. at p. 2). Although the amended complaint is 90 pages long and includes 278 paragraphs, it suffers from the same deficiencies as the original complaint. Conclusory allegations and information attributed to unreliable sources do not collectively create a strong inference of fraud. A putative class representative in a

securities class action can't rely on the possibility that evidentiary support might be developed

during discovery. *See Dura Pharmaceuticals, Inc. v. Broudo,* 125 S.Ct. 1627, 73 U.S.L.W. 4283

(April 19, 2005) (requiring a securities fraud plaintiff to adequately plead each element of the

claim prevents a private securities action from being transformed into a "partial downside

insurance policy."). The plaintiffs' amended complaint fails to state a claim against the

defendants under § 10(b) of the Exchange Act and Rule 10b-5.

*Control person liability*

Section 20(a) of the Exchange Act states:

> Every person who, directly or indirectly, controls any person liable under any
> provision of this chapter or of any rule or regulation thereunder shall also be liable
> jointly and severally with and to the same extent as such controlled person to any
> person to whom such controlled person is liable, unless the controlling person acted
> in good faith and did not directly or indirectly induce the act or acts constituting the
> violation or cause of action.

15 U.S.C. § 78t(a). "To state a prima facie case of control person liability, the plaintiff must

establish (1) a primary violation of securities laws and (2) 'control' over the primary violator by

the alleged controlling person." *Kinder-Morgan,* 340 F.3d at 1107; *Fleming,* 264 F.3d at 1270-

71. Because the amended complaint fails to state a claim under § 10(b) of the Exchange Act for

securities fraud against the defendants, the allegations of control person liability also fail.

As to Mr. Nields, the § 20 claim fails for the additional reason that his status as a member

of the board of directors during the Class Period is insufficient to establish that he was a

controlling person within the meaning of the Exchange Act.[4]   Under Delaware law, control of

the Company rested with the board of directors – not the individual directors. *See* DEL. CODE

---

[4]Mr. Nields is the only board member named as an individual defendant.

ANN. tit. 8 § 141(a).

"Control" is shown by "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998). "The assertion that a person was a member of a corporation's board of directors, without any allegation that the person individually exerted control or influence over the day-to-day operation of the company, does not suffice to support an allegation that the person is a control person within the meaning of the Exchange Act." *Kinder-Morgan*, 340 F.3d at 1108.

As set forth above, the amended complaint contains only seven factual allegations about Mr. Nields.  None of the these show that Mr. Nields exerted control or influence over the day-to-day operations of the Company during the Class Period.

Based on the foregoing, it is

ORDERED that motion of defendant Fischer Imaging Corporation to dismiss the amended complaint is granted;

FURTHER ORDERED that defendant Morgan Nields' motion to dismiss the amended class action complaint is granted;

FURTHER ORDERED that defendant Louis Rivelli's motion to dismiss the amended class action complaint is granted; and

FURTHER ORDERED that the amended complaint is dismissed without prejudice.

Dated:  June 21$\underline{\text{st}}$, 2005

BY THE COURT:

Senior District Judge Richard P. Matsch